**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JERRY LYNN GUNNING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-25-263-PRW |
| | ) | |
| STEVEN HARPE, in his official capacity | ) | |
| as Director of the Oklahoma Department of | ) | |
| Corrections, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Before the Court are the Motions to Dismiss filed by Defendant Tommy Humphries,

Garfield County District Attorney, and Defendants City of Enid and Bryan Skaggs, Chief

of the Enid Police Department (Dkts. 47, 50). The motions are fully briefed and ripe for

review. For the reasons explained below, the motions are **GRANTED**, and Plaintiff Jerry

Gunning's Second Amended Complaint is dismissed without prejudice.

### *Background[1]*

This civil-rights action arises from Plaintiff Jerry Gunning's 1992 convictions in

two separate rape prosecutions in Garfield County, Oklahoma. Gunning brings this action

under 42 U.S.C. § 1983 against the City of Enid, Enid Police Chief Bryan Skaggs, and

---

[1] The Court considers the factual allegations contained within the four corners of the Second Amended Complaint (Dkt. 46), as well as the exhibits attached to and incorporated by reference in the Second Amended Complaint (Dkt. 46). *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (collecting cases).

1

Garfield County District Attorney Tommy Humphries. Skaggs and Humphries are sued in their official capacities.

Gunning alleges that his constitutional rights were violated by the loss or destruction of a hair follicle introduced at one of his trials; the alleged nondisclosure of photo-lineup evidence from other rape investigations in which he was apparently considered a suspect; and the alleged nondisclosure of personnel or disciplinary records concerning two Enid police officers involved in his cases.

He seeks damages and injunctive relief.

## I.     Gunning's 1992 Convictions

In 1992, Gunning was tried in two separate cases. In Case No. CF-1991-411, a jury convicted him of first-degree rape of fourteen-year-old N.G.P. In Case No. CF-1991-414, a separate jury convicted him of first-degree rape and two counts of forcible sodomy of an elderly woman, J.H. Gunning received sentences totaling 545 years' imprisonment and has remained incarcerated since 1992.

### A.     The N.G.P. Case

At the trial involving N.G.P., the State introduced a hair follicle allegedly recovered from the victim's body. The Oklahoma State Bureau of Investigation compared the follicle with samples from Gunning's head, limbs, and pubic region and reported that the samples were "consistent with" the follicle recovered from N.G.P. [2]

---

[2] Mot. (Dkt. 46, Ex. 2), at 4–5.

The record is unclear as to whether the follicle was subjected to DNA testing at the time of trial. In his Second Amended Complaint, Gunning alleges that neither the prosecution nor defense counsel sought DNA testing, which he characterizes as relatively new at the time. But in a later state-court motion seeking postconviction DNA testing, Gunning alleged that the follicle "was tested in the original trials."[3] He also argued that advances in DNA testing could now produce exculpatory results and submitted an affidavit stating that "DNA evidence was used against [him] at trial."[4] In that affidavit, he asserted that any finding matching him to the follicle resulted from "scientific error" by the OSBI.[5]

In addition to the hair follicle, N.G.P. identified Gunning through a photo lineup, although Gunning challenges the reliability of that identification. According to the materials attached to the Second Amended Complaint, N.G.P. initially failed to identify him when police first presented the lineup. A detective later testified that N.G.P. had been awakened when police arrived, briefly looked at the photographs, and stated that her attacker was not present. N.G.P. later identified Gunning with help from her sister.

The materials attached to the Second Amended Complaint also provide additional context. According to those materials, Gunning entered N.G.P.'s home, ordered N.G.P. and her thirteen-year-old sister to undress, dragged both girls upstairs by their hair, and forced N.G.P.'s sister to watch as he raped N.G.P. When police presented N.G.P.'s sister

---

[3] *Id.* at 6.

[4] *Id.* at 9.

[5] *Id.*

with a photo lineup, she pointed to Gunning's photograph and stated, "He's the one."[6]
When asked whether she was sure, she responded that she was "very positive."[7]

### B.   The J.H. Case

The State apparently presented no biological evidence in the prosecution involving J.H. According to Gunning, the State's case depended primarily on photo-lineup identification.

The Second Amended Complaint is not always clear, but the preliminary-hearing transcript attached to it shows that J.H. testified she viewed two photo lineups.[8] She first viewed a lineup at her daughter's home a few days after the attack. That lineup included a photograph of Gunning. According to the transcript, J.H. stated that the attacker "looked something like" Gunning's photograph, except that her attacker had a "full mustache."[9] She then identified another person in the lineup as the perpetrator.

The record is unclear about the precise sequence of events. Officer Randy Coleman testified that he photographed Gunning during a September 7, 1991 police-station interview and included that photograph in the first lineup shown to J.H. (where J.H. described the "full mustache").[10] Detective Christopher Bush testified that on September 9, 1991, after Gunning had been arrested, Bush took a new photograph of Gunning and

---

[6] Report (Dkt. 46, Ex. 15), at 3.

[7] *Id.*

[8] Transcript (Dkt. 46, Ex. 26), at 4–5.

[9] *Id.* at 4.

[10] *Id.*

replaced the earlier photograph because he was unsure when the first photograph had been taken and because the new photograph reflected how Gunning "looked then."[11] The record does not explain how Gunning's appearance changed during the two-day period.

J.H. later viewed a second lineup at the police station. She testified that the photographs had been shuffled, that a new photograph of Gunning was included, and that she identified Gunning as her attacker.

## II.    Gunning's Post-Conviction Efforts to Obtain Evidence

In September 2022, approximately thirty years after his convictions, Gunning moved in Garfield County District Court for DNA testing of the hair follicle introduced in CF-1991-411. He argued that if modern DNA testing showed he was not the source of the follicle, that result would exonerate him in the N.G.P. case and cast doubt on his conviction in the J.H. case.

In response, the State reported that, after contacting the Enid Police Department, no evidence related to Gunning or his rape cases could be located. The Garfield County District Attorney's Office likewise could not locate any biological evidence. As a result, postconviction DNA testing could not be performed.

In January 2025, Gunning submitted an open-records request seeking: all evidence reports, records, or orders concerning evidence relating to him; all evidence records connected to Garfield County Case Nos. CF-1991-411 and CF-1991-414; and all incident reports concerning or naming him as a party or suspect.

---

[11] *Id*. at 7–8.

According to Gunning, the Enid Police Department did not provide documentation, orders, or records concerning evidence from the two rape cases, nor did it provide records showing disposal of evidence in either case. The Department did provide certain unrelated or background records, including a 1987 shoplifting citation, arrest reports from 1986, 1987, and 1989, two incident reports from 1991, and other reports ranging from tickets to arrests from 1986 through the 1991 cases. But the Department informed Gunning that "no documentation of any evidence" from the rape convictions appeared to exist.[12]

### III.    Officers Rose and Bush

Gunning's allegations also focus on two Enid police officers: Tommy Rose and Christopher Bush.

Rose is currently an evidence technician for the Enid Police Department. He appears to have been the technician who determined that no evidence from the 1992 rape cases remained in police custody. Gunning alleges that Rose previously served as an Enid police detective, worked on both rape investigations, interviewed Gunning, created or administered some of the photo lineups, fingerprinted Gunning, and helped collect the hair samples compared to the missing follicle.

Gunning also describes Rose's later involvement in an unrelated 1997 double-homicide investigation. Charges against three defendants in that case were dismissed for insufficient evidence. In 1998, Rose was found to have violated Enid Police Department policies in that investigation by failing to follow lineup procedures, failing to provide all

---

[12] Second Am. Compl. (Dkt. 46) ¶ 43.

evidence to prosecutors, failing to make regular progress reports, and failing to exercise proper control over case files, causing some files to be lost.

Bush was involved in preparing a photo lineup for J.H. He was also an affiant of an unspecified document in CF-1991-414 and was endorsed as a witness in CF-1991-411. Gunning obtained Bush's personnel records and discovered that Bush had been suspended for thirty days without pay in 1981, while working as a patrolman. The record does not identify the reason for the suspension.

## IV.    Other Contemporaneous Rape Investigations

Gunning further alleges that Enid police appeared to believe the same suspect was responsible for approximately four rapes in Enid, including the assaults on N.G.P. and J.H.[13] In support, he cites a forensic-report request from the Enid Police Department to OSBI concerning tests on his hair sample. That request stated: "There are several other rapes in our city that [this] suspect could have done. No proof."[14] He also cites a statewide bulletin stating that Gunning matched the description of the suspect in four rapes.

From this, Gunning reasons that if the Enid Police Department lost or destroyed evidence from his two prosecuted rape cases, then it may also have lost or destroyed evidence from other unsolved rape investigations in which he may have been a suspect. He also alleges that any photo lineups from those other investigations may have failed to

---

[13] *Id.* ¶ 49.

[14] OSBI Evidence Submission Form (Dkt. 46, Ex. 13) (emphasis added).

identify him or may have identified someone else. According to Gunning, such evidence should have been disclosed before his trials.

Gunning acknowledges, however, that he does not know whether such lineups occurred, when they occurred, whether he was included in them, whether any victim failed to identify him, or whether any other suspect was identified.

## V.    Claims Asserted

Gunning brings claims under § 1983 for alleged violations of his constitutional rights, invoking *Brady v. Maryland*, *Giglio v. United States*, *California v. Trombetta*, and *Arizona v. Youngblood*. He alleges that Defendants violated his due-process rights by failing to disclose exculpatory or impeachment evidence and by losing or destroying potentially exculpatory biological evidence.

Against the Garfield County District Attorney, Gunning seeks injunctive relief to prevent further alleged *Brady* and *Giglio* violations and further loss or destruction of evidence. [15] Against the City of Enid and Chief Skaggs, he seeks damages and injunctive relief, though the Second Amended Complaint does not clearly identify the precise injunction requested.

Defendants move to dismiss under Rules 12(b)(1) and 12(b)(6), arguing that the Court lacks subject-matter jurisdiction over certain claims and that the Second Amended Complaint fails to state a claim.

---

[15] Second Am. Compl. (Dkt. 46) ¶ 99.

## *Legal Standard*

A motion under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction.[16] Such a motion may present either a facial attack or a factual attack. A facial attack challenges the sufficiency of the complaint's jurisdictional allegations,[17] and the Court applies a standard similar to that governing Rule 12(b)(6) motions. [18]

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter to state a claim that is plausible on its face.[19]  The Court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff. [20]  The Court also draws all reasonable inferences in the plaintiff's favor.[21] But the Court need not accept legal conclusions, labels, or formulaic recitations of the elements of a claim.[22]

## *Analysis*

Defendants' motions raise several distinct issues. The Court addresses them in the following order.

First, several of Gunning's claims are barred by *Heck v. Humphrey* because success on those claims would necessarily imply the invalidity of his convictions. Second, even

---

[16] *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).

[17] *Id.* (citing *Pueblo of Jemez v. United States*, 790 F.3d 1143, 1148 n.4 (10th Cir. 2015)).

[18] *Garling v. United States Environmental Protection Agency*, 849 F.3d 1289, 1293 n.3 (10th Cir. 2017) (internal citation omitted).

[19] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[20] *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1352 (10th Cir. 1996)).

[21] *Doe v. Woodard*, 912 F.3d 1278, 1285 (10th Cir. 2019) (citation omitted).

[22] *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).

where *Heck* does not bar the claims, Gunning fails to plead a municipal policy or custom sufficient to support official-capacity or municipal liability under *Monell*. Third, the Second Amended Complaint does not plausibly allege a *Brady* or *Giglio* violation. Fourth, it does not plausibly allege a due-process violation under *Trombetta* or *Youngblood*. Finally, Gunning is not entitled to injunctive relief.

### I. Heck Bars Claims That Would Necessarily Imply the Invalidity of Gunning's Convictions

A § 1983 claim is not cognizable if judgment in the plaintiff's favor would necessarily imply the invalidity of his conviction or sentence,[23] unless that conviction or sentence has already been invalidated.[24] This rule prevents a prisoner from using § 1983 as a substitute for habeas relief.

The distinction is important. If success on a § 1983 claim would establish that a conviction is invalid, the claim does not accrue unless and until the conviction has been reversed, expunged, declared invalid, or called into question through habeas. But if success on the claim would not undermine the conviction, the claim may proceed under § 1983.[25]

Here, Gunning alleges that the missing hair follicle would exonerate him if it could be tested. He also alleges that biological evidence from the crime scene "would not match his DNA profile and would exonerate him." His *Brady*, *Trombetta*, and *Youngblood*

---

[23] *Torres v. Madrid*, 60 F.4th 596, 600 (10th Cir. 2023) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)) (emphasis in original).

[24] *Garza v. Burnett*, 672 F.3d 1217, 1218 (10th Cir. 2012) (quoting *Heck*, 512 U.S. at 490).

[25] *Heck*, 512 U.S. at 487.

theories concerning the hair follicle therefore rest on the premise that the missing evidence would demonstrate his innocence or invalidate his convictions.

Those claims are barred by *Heck*. A judgment in Gunning's favor on those theories would necessarily imply that his convictions are invalid. Such claims must be pursued, if at all, through habeas or other appropriate postconviction proceedings, not through § 1983. By contrast, Gunning's claims concerning the alleged nondisclosure of Rose's and Bush's disciplinary histories do not necessarily imply the invalidity of his convictions. Those claims are not barred by *Heck*. But, as explained below, they fail on the merits.

## II.  Gunning Fails to Plead Municipal Liability Under *Monell*

Because Gunning sues the City of Enid and sues Skaggs and Humphries in their official capacities, he must satisfy the requirements for municipal liability under *Monell*.

A municipality is not vicariously liable under § 1983 merely because its employees allegedly violated the Constitution. Instead, a plaintiff must plausibly allege: (1) the existence of a municipal policy or custom; and (2) a direct causal link between that policy or custom and the alleged constitutional injury. [26]

A municipal custom must be more than an isolated incident. It must be a widespread, continuing, and persistent practice with the force of law.[27] Allegations of similar

---

[26] *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[27] *Id.* (quoting *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993) (internal quotation marks omitted)).

unconstitutional conduct affecting others are ordinarily important to showing such a custom.[28]

Gunning has not plausibly alleged any municipal policy or custom that caused a constitutional violation. He alleges that the Garfield County District Attorney's Office and the Enid Police Department lack policies or procedures ensuring that exculpatory evidence is communicated to prosecutors and disclosed to criminal defendants. But he does not allege a widespread pattern of similar *Brady* or *Giglio* violations. Instead, he attempts to infer a systemic defect from alleged failures connected to his own cases.

That is insufficient. Apart from the missing hair follicle, Gunning has not plausibly alleged that any exculpatory evidence existed, much less that it was suppressed pursuant to a municipal policy or custom.

Nor does the Second Amended Complaint plausibly allege a failure-to-train theory.[29] A municipality's liability for failure to train is at its most tenuous because a plaintiff must show deliberate indifference.[30] That requires factual allegations showing that policymakers were on actual or constructive notice that training was deficient and that the deficiency was likely to result in constitutional violations.[31] Ordinarily, a pattern of similar constitutional violations is necessary.[32]

---

[28] *See Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (collecting cases).

[29] *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

[30] *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)).

[31] *Id.* at 61 (internal citations omitted).

[32] *Id.* at 62 (internal citations and quotation marks omitted).

Gunning alleges no such pattern. To the extent he alleges that Defendants failed to train police or prosecutors regarding *Brady* and *Giglio* obligations, the allegation is conclusory and unsupported by facts showing deliberate indifference. Accordingly, Gunning fails to state a *Monell* claim against the City of Enid, Chief Skaggs in his official capacity, or District Attorney Humphries in his official capacity.

## III.   Gunning fails to state a *Brady* or *Giglio* claim.

To establish a *Brady* violation, a plaintiff must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. [33] *Giglio* applies to impeachment evidence and is evaluated under the same general framework.

Gunning's *Brady* and *Giglio* theories concern four categories of evidence: the missing hair follicle, speculative lineup evidence from other investigations, J.H.'s lineup evidence, and Rose's and Bush's disciplinary histories. None states a plausible claim.

### A.   Missing Hair Follicle

There is no *Brady* violation where the defendant knew or should have known the essential facts permitting him to use the evidence.[34]  Gunning knew about the hair follicle at the time of trial. Indeed, the follicle was introduced into evidence. His complaint is not

---

[33] *United States v. Cordova*, 25 F.4th 817, 826 (10th Cir. 2022) (quoting *United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012) (internal quotation marks omitted)).

[34] *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) (quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998)) (internal quotation marks omitted).

that the State suppressed the follicle before trial, but that the follicle is now missing and therefore cannot be subjected to modern DNA testing.

That allegation does not state a *Brady* claim under § 1983. To the extent Gunning argues that DNA testing would exonerate him, the claim is also barred by *Heck* for the reasons already explained.

### B.    Speculative Lineup Evidence

Gunning next alleges that police may have conducted photo lineups in other contemporaneous rape investigations, that he may have been included in those lineups, and that victims may have failed to identify him or may have identified someone else.

This theory is too speculative to state a *Brady* or *Giglio* claim. Gunning does not identify any specific lineup, when it occurred, who viewed it, whether he was included, whether anyone failed to identify him, or whether anyone identified another suspect. Nor does he allege facts establishing that any such evidence existed before trial and was suppressed. A *Brady* or *Giglio* claim cannot rest on the mere suspicion that favorable evidence might exist.[35] The existence of favorable evidence must be plausibly alleged. Gunning has not done so.

The claim also fails on materiality. Even assuming that other rape victims failed to identify Gunning in unrelated investigations, Gunning has not plausibly shown a reasonable probability that disclosure of that evidence would have changed the outcome in

---

[35] *Erickson*, 561 F.3d at 1163 (internal citation omitted).

either prosecuted case.[36] The victims in his cases identified him, and in the N.G.P. case the State also introduced hair-comparison evidence. Evidence that other victims in other unsolved cases did not identify him has no obvious exculpatory value in the prosecutions at issue and may not have been admissible at all.

And to the extent Gunning contends such evidence would have shown his innocence, the claim would again run into *Heck*.

### C. J.H.'s Lineup Evidence

Gunning also argues that the State failed to disclose problems with J.H.'s identification, including her initial misidentification and the circumstances surrounding the two lineups.

The record attached to the Second Amended Complaint defeats this claim. The preliminary-hearing transcript shows that testimony was given about how the lineups were prepared and that J.H. testified about her initial misidentification.[37] Because the defense knew of these facts, they were not suppressed. Accordingly, Gunning fails to state a Brady or Giglio claim based on J.H.'s lineup evidence.

### D.    Rose and Bush's Disciplinary Histories

Finally, Gunning alleges that Defendants failed to disclose impeachment evidence concerning Rose and Bush.[38] This theory also fails.

---

[36] *Banks v. Workman*, 692 F.3d 1133, 1142 (10th Cir. 2012) (quoting *United States v. Burke*, 571 F.3d 1048, 1053 (10th Cir. 2009) (internal quotation marks omitted)).

[37] Transcript (Dkt. 46, Ex. 26).

[38] Second Am. Compl. (Dkt. 46) ¶ 86.

Rose's relevant disciplinary findings arose in 1998, approximately six years after Gunning's convictions. Evidence that did not exist at the time of trial could not have been suppressed before trial. Nor does Rose's later discipline in an unrelated homicide investigation plausibly establish that he mishandled or manipulated evidence in Gunning's cases.

Bush's suspension occurred in 1981, approximately ten years before Gunning's trials, and the record does not identify the reason for the suspension. Gunning does not allege facts showing that the suspension involved dishonesty, evidence handling, witness identification, or any matter bearing on Bush's credibility in Gunning's cases.

Nor does Gunning plausibly allege materiality. The alleged disciplinary records have no clear logical nexus to the identification evidence in his prosecutions. The alleged deficiencies in the lineups were known to the defense by the preliminary hearings, and Gunning does not allege that he was prevented from challenging the lineups at trial.

Accordingly, the Second Amended Complaint does not state a *Brady* or *Giglio* claim based on Rose's or Bush's disciplinary histories.

## IV.    Gunning fails to state a *Trombetta* or *Youngblood* claim.

Gunning also alleges that Defendants violated due process by losing or destroying the hair follicle.

The Due Process Clause imposes a duty on the government to preserve evidence that might be expected to play a significant role in the defense. Under *Trombetta*, a plaintiff must show that the evidence had apparent exculpatory value before it was destroyed and that comparable evidence was not reasonably available. Under *Youngblood*, when evidence

16

is only potentially useful, failure to preserve it violates due process only if law enforcement acted in bad faith.[39] Gunning does not plausibly satisfy either standard.

The hair follicle was known to Gunning at trial and was used by the State as inculpatory evidence. Gunning does not allege that he sought DNA testing during trial, during direct appeal, or at any point before the evidence was lost. He also does not allege when the follicle was lost or destroyed, who was responsible, or what the responsible officials knew at the time.

Those omissions are critical. To plead a plausible due-process claim based on destruction of evidence, Gunning must allege facts supporting an inference that officials knew the evidence had exculpatory or potentially exculpatory value when it was lost or destroyed. The Second Amended Complaint does not do so. Instead, Gunning speculates that the destruction "could have been an effort to circumvent the *Brady* requirements after learning new information that is not known to Counsel."[40]   That is conjecture, not a plausible allegation of bad faith.

Gunning also references Oklahoma postconviction DNA-testing procedures and evidence-retention requirements, as well as an Enid Police Department evidence-retention policy.[41] But a violation of state law or internal policy, standing alone, does not establish a

---

[39] *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

[40] Second Am. Compl. (Dkt. 46) ¶ 67 (emphasis added).

[41] Policy (Dkt. 46, Ex. 7) (requiring that "[e]vidence ordered destroyed must be destroyed in accordance with Oklahoma law").

federal due-process violation.[42]  The constitutional question is governed by *Trombetta* and *Youngblood*, and Gunning has not alleged facts satisfying either standard.

Nor does the Constitution create a freestanding right to postconviction access to the State's evidence for DNA testing.[43]  A convicted prisoner may challenge the fundamental adequacy of a state's postconviction DNA-testing procedures,[44] but Gunning does not bring such a claim. His claim instead concerns the loss or destruction of evidence. Because he does not plausibly allege apparent exculpatory value, bad faith, or prejudice, the claim fails.

## V.    Gunning is not entitled to injunctive relief.

Gunning also seeks prospective injunctive relief. His request fails for two independent reasons.

### A.    Gunning lacks standing to seek prospective relief.

To obtain prospective injunctive relief, a plaintiff must allege a real and immediate threat of future injury.[45]  Past injury alone is insufficient. The threatened injury must be concrete, actual or imminent, and not merely conjectural or hypothetical.[46]

---

[42] *See Eidson v. Owens*, 515 F.3d 1139, 1149 (10th Cir. 2008) (holding that "a violation of state law alone does not support a § 1983 claim" (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992))).

[43] *McDaniel v. Suthers*, 335 F. App'x 734, 736 (10th Cir. 2009) (quoting *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 61 (2009)).

[44] *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009)

[45] *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)) (internal quotation marks omitted).

[46] *Id.* (quoting *Golden v. Zwickler*, 394 U.S. 103, 109–10 (1969)).

Gunning has not alleged such an injury. His asserted injuries concern past events: the alleged nondisclosure of evidence before his 1992 trials, the later loss of the hair follicle, and the alleged failure to disclose officer disciplinary information. He attempts to characterize those injuries as ongoing because he remains incarcerated. But the continued consequences of a past conviction do not transform alleged trial-related *Brady*, *Giglio*, *Trombetta*, or *Youngblood* violations into ongoing constitutional violations remediable by prospective injunctive relief in this § 1983 action.

To the extent Gunning seeks an order requiring Defendants to disclose exculpatory evidence, the request is speculative because he has not plausibly alleged that Defendants currently possess undisclosed exculpatory evidence. The hair follicle appears to be missing. The alleged photo-lineup evidence from other investigations is hypothetical. And the officer disciplinary materials do not plausibly constitute material *Brady* or *Giglio* evidence. Gunning also suggests that Rose's current role as an evidence technician creates an ongoing violation because Rose participated in the original investigations and later searched for evidence from those cases. But Gunning identifies no constitutional right to have a particular evidence technician excluded from a postconviction evidence search. At most, he alleges a concern about best practices, not a federal constitutional injury.

Because Gunning has not plausibly alleged an ongoing constitutional violation or a real and immediate threat of future injury, he lacks standing to seek prospective injunctive relief.

19

**B.      The requested injunction is impermissibly broad.**

Gunning's requested injunction is also improper. In his response brief, he clarifies that he seeks an order requiring the Garfield County District Attorney's Office and the Enid Police Department to promulgate policies and procedures ensuring that both agencies work together to provide criminal defendants the evidence to which they are constitutionally entitled.[47]

That proposed injunction is, in substance, an order requiring Defendants to obey the law.[48] Federal courts may not issue broad injunctions commanding state or local officials to comply generally with constitutional requirements.[49] Such injunctions lack the specificity required for equitable relief and improperly place federal courts in the role of supervising state and local law-enforcement agencies.[50]

Accordingly, even if Gunning had standing, the Court would not enter the requested injunction.

### *Conclusion*

Gunning's Second Amended Complaint fails for several independent reasons.

---

[47] Resp. (Dkt. 51), at 19.

[48] *See Trump v. CASA, Inc.*, 606 U.S. 831, 858 (2025) (discussing the Executive Branch's "duty to follow the law" and the Judiciary's constraints in enforcing such an obligation).

[49] *Lutnes v. State of Oklahoma*, Case No. CIV-25-1252-PRW, 2026 WL 1228468, at *6 (W.D. Okla. May 4, 2026) (quoting *VerSteeg v. Bennett, Deloney & Noyes, P.C.*, Case No. 08-CV-153-B, 2009 WL 10670543, at *2 (D.Wyo. Feb. 19, 2009)) (internal quotations omitted).

[50] *Sockey v. Gray*, 159 F. App'x 821 (10th Cir. 2005) (internal citations omitted).

His claims concerning the missing hair follicle are barred by *Heck* to the extent success would imply the invalidity of his convictions. His remaining allegations fail to state a plausible *Brady*, *Giglio*, *Trombetta*, or *Youngblood* violation. He also fails to allege a municipal policy, custom, or deliberately indifferent failure to train sufficient to support official-capacity or municipal liability under *Monell*. Finally, he has not established standing to seek prospective injunctive relief, and the injunction he requests is impermissibly broad.

Accordingly, Defendants' Motions to Dismiss (Dkts. 47 and 50) are **GRANTED**. Plaintiff's Second Amended Complaint (Dkt. 46) is **DISMISSED WITHOUT PREJUDICE**. The Clerk of Court is **DIRECTED** to unseal the case and maintain under seal only the original unredacted filings. A separate judgment will issue.

**IT IS SO ORDERED** this 29th day of June 2026.

_____

PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE